### 17020

LOUISA T. HALL, JAMES EDWIN HALL, JR., and ROY PRESTON HALL, Appellants, v. THE CITY OF GREENVILLE, Respondent

(88 S. E. (2d) 246)

376

*Messrs. Hinson, Traxler & Hamer,* of Greenville, *for Appellant,*

*Messrs. A. C. Mann* and *W. H. Arnold,* of Greenville, *for Respondent,*

*Messrs Hinson, Traxler & Hamer,* of Greenville, *for Appellant, in reply,*

June 16, 1955.

Legge, Justice.

Appellants, tenants in common of five adjoining houses and lots on Dobbin Street, in the section of the City of Greenville known as Meadow Bottom, brought this action under Section 7301 of the 1942 Code (Section 59-224 of the 1952 Code), against the city for damages allegedly resulting to these properties by reason of the installation of concrete curbs, gutters and other improvements in certain other streets, lying uphill from their properties, whereby, according to their complaint, due to the inadequacy of the drains installed by the city, surface water from the network of streets lying between their properties and West Washington Street is channelled to and deposited upon their properties, rendering them unfit for habitation. In its answer the respondent alleged that the area in which appellants' properties are located had been for many years a low one, subject to flooding by the Reedy River in times of excessive rainfall; that appellants knew of this condition when they acquired these properties; that respondent had done nothing to increase the flow of surface water on their property; and that "because of the general low and swampy area where plaintiffs' property is located, the Board of Health of the City of Greenville * * * after due notice and hearings, saw fit, for the protection of the general health and welfare of the citizens of the City of Greenville, to require plaintiffs' property to be vacated by their tenants as said property was unfit for human habitation considering all of the surrounding facts and circumstances relative to the location and general condition of plaintiffs' property".

At the close of plaintiffs' case, respondent moved for a nonsuit upon the following grounds:

1. That Section 59-224 of the 1952 Code was not applicable, because the plaintiffs' testimony showed that if any water from the city streets reached their property it was the result of the overflow of a live stream that the city was using for drainage in that area.

2. That plaintiffs had failed to prove that the city had been guilty of negligence in connection with its street improvements in the area in question, the testimony showing that the street construction was proper and conformable to good engineering practices, and that the branch in question had overflowed during heavy rains before any streets in the area were paved.

3. That plaintiffs' testimony showed that their damage, if any, had resulted from the condemnation of their property by the city's Board of Health as unfit for human habitation, which action by the Board of Health had not been shown to have been arbitrary or capricious.

4. That there was no evidence that plaintiffs had made the demand upon respondent required by the statute.

The trial judge's order, from which this appeal is taken, granted the motion on all of the grounds above mentioned.

Appellants rest their appeal upon five exceptions, of which the first four challenge the correctness of the trial judge's rulings on the four grounds of nonsuit before set out, and the fifth charges error in his refusal to allow the introduction in evidence of Section 550(4) of the 1944 Code of the City of Greenville.

Mr. L. P. Slattery, former city engineer of the City of Greenville, testified for the plaintiffs, and under his testimony there was introduced in evidence a map which he had prepared showing the drainage area involved. From this map, the following appears: From West Washington Street the terrain slopes downward in a general southwesterly direction to the Reedy River. Roughly paralleling West Washington Street, and between it and the river, are the following streets, in the order named: Forest, Oscar, Dobbin, Chestnut (which adjoins to the north the old riverbed), and Welborn; and they extend generally northwest-southeast between the right-of-way of Southern Railway Company on the northwest and Trescott Street on the southeast. To the west of Trescott is an open branch or ditch run-

ning generally south from West Washington to the old bed of the Reedy River approximately at the intersection of Chestnut and Trescott, at which point it turns eastward, again joining the old river-bed at Nassau Street, and thence proceeds on a course slightly south of east along the old river-bed to Hudson Street and on to the river. The plaintiffs' five houses are located on the southwest side of Dobbin Street, the nearest being about 125 feet from the branch or ditch. The culverts through which this branch crosses under Forest Street and under Oscar Street respectively are 6 feet wide by 6 feet deep; the opening through which it crosses under Dobbin Street is 6 feet wide by 3 feet deep, and consists of a wooden bridge with rock abutments.

From Mr. Slattery's testimony, it appears that when the P. & N. Railroad was constructed, more than twenty years prior to the commencement of this action, the course of the Reedy River was altered, so that the river in this vicinity is now located considerably south of the old river-bed. From the point at or near the intersection of Chestnut and Trescott, where the branch or ditch above mentioned changes its course from southward to eastward, the distance to the Reedy River in a straight line running approximately south is about 550 feet and in that distance the fall is 6.6 feet, a grade of .12. The length of the branch or ditch on its eastward course, from the intersection of Chestnut and Trescott to Hudson Street, is 1,600 feet, and the fall 3.2 feet, a grade of .002, which in the opinion of this witness is insufficient to keep the ditch clean and the water flowing, in view of the "large material that comes down".

The course of the branch or ditch from West Washington Street to the old bed of the Reedy River at or near the intersection of Chestnut and Trescott has been the same from time immemorial. From the last mentioned point to Hudson Street it does not follow the meanderings of the old riverbed, but runs eastwardly in a straight line approximately 830 feet to Nassau Street, where it is joined by a ditch running southeast from the old river-bed and another ditch

which is laid in the old river-bed and comes in from the north. The last mentioned ditch commences at Dunn Street, a short street running eastward from Trescott just south of the junction of Dobbin with Trescott, and was evidently designed as part of the drainage for the area east of Trescott. From the point where it is joined by these two ditches, the course of the branch turns slightly to the southeast and thence proceeds in a straight line approximately 830 feet to where it crosses Hudson Street.

Throughout its course from West Washington to Hudson Street the branch or ditch runs through private property except where it crosses Forest, Oscar, Dobbin, Chestnut, Trescott and Nassau Streets. There is nothing in the evidence to show by whom or when its course from the intersection of Chestnut and Trescott to Hudson Street was laid, though inferentially it must have been at or after the time of the diversion of the river by the construction of the P. & N. Railroad.

Mr. Slattery testified that the velocity and volume of flow of surface water is greater where streets are paved and curbs and gutters are installed than where the area is unpaved and without curbs and gutters, engineering handbooks on such matters indicating that after paving the "quick flow" is increased anywhere from twenty-five to seventy-five per cent. He further testified that if the branch had so much water in it that the 6′ x 6′ culverts at Forest and Oscar streets were full, it would overflow the 6′ x 3′ opening at Dobbin Street. In his opinion the drainage of the area in question could be improved by channelling the branch due south from its turning point at the intersection of Chestnut and Trescott to the Reedy River. The only street in this area, other than West Washington, that has curbs and gutters, is Oscar Street.

Mr. J. Mack Richardson, who had been from 1939 to 1949 Superintendent of Streets of the City of Greenville, testified in substance as follows: West Washington Street

has been paved for many years; Oscar Street was paved in 1941 or 1942; Forest Street and Meadow Street (which runs eastward from Trescott just north of the junction of Trescott and Dobbin) were paved in 1948. After paving, the velocity of surface water is increased from twenty-five to thirty per cent., and the water reaches its destination in greater volume and with greater force. During the period that witness served as Superintendent of Streets, the city cleaned out the ditches in the Meadow Bottom area, and this was necessary for satisfactory drainage. In the opinion of this witness drainage could be effected by extending the branch or ditch from the intersetion of Chestnut and Trescott directly to the river; but he was unprepared to estimate the cost. On cross-examination he testified that there was nothing wrong with the type of paving in this area, or, from an engineering or practical standpoint, with the curbing and guttering, or with the catchbasins that are installed in the paving of Oscar Street. On re-direct, he testified that it is good engineering practice to drain into a natural stream.

The five houses in question were bought in 1927 and 1929 by J. E. Hall, who thereafter died intestate at some date not revealed by the record more specifically than that it was prior to July 23, 1951. The plaintiffs are his heirs at law, and the amended complaint in the present action was served on March 6, 1952.

Mr. J. E. Gosnell testified that he had been engaged in the real estate business for twenty years, and that he collected rents from the Hall houses from 1933 or 1934 until they are closed by the city Board of Health; that prior to the time of their "closing" their value was $10,000.00, and thereafter nothing; that prior to the closing of these houses he had several times seen water standing in the yards and running down the streets when the branch overflowed, and that prior to their closing the city cleaned out the "branches" in the Meadow Bottom area. On cross-examination, he testified that since 1931 or 1932 he had seen this area, which is flat and marshy, flooded by water backed up from the

river, but only once to the extent that it was rendered inaccessible by automobile.

Mr. Ralph Cox, another real estate and rental agent, testified that he had been familiar with the Hall houses since 1928, and had collected rents there until 1935 or 1936; and that during that period he had seen the branch overflow both its banks so that there was water all around and under these houses. He testified that Dobbin Street is unpaved, and that Trescott Street has a blacktop or asphalt surface and open dirt ditches on either side.

Mrs. Louisa T. Hall, the widow of J. E. Hall, was the only one of the plaintiffs to take the witness stand. Her testimony was to the effect that she collected the rent from one of the houses; that she didn't go down there much, as the tenant brought the rent money to her; and that the tenants complained about the water, and that "the water got worse when they began to pave the streets above".

Larry Moseley, who for about eleven years before the trial of the case had lived on Oscar Street, one block from where the branch crosses it, testified that prior to 1952 the branch often overflowed; that when Oscar Street was paved and the curbing and gutters were put in trash would collect under the little wooden bridge on Dobbin Street, causing the water to overflow on both sides; and that the ditches are now kept cleaned and the place looks better than it did in 1951.

Edgar Maddox, who had lived on Trescott Street for about ten years prior to the commencement of this action, testified that when he first moved into that neighborhood the curbs and gutters had already been installed in Oscar Street, and that at that time the branch was full of trash and the ditches were "just about level-full"; that in rainy weather the water in Oscar Street "jumps the road and goes on toward the branch"; and if the branch is stopped up it runs over toward the Hall houses. He testified that prior to 1951 he had once or twice seen the city workmen cleaning out the branch, and that its condition now is "pretty good".

James White, another resident of the neighborhood, now living on Trescott Street, testified that from 1947 to 1951 he had lived on Dobbin Street, just across from the Hall houses; and that before he moved from there the branch had been in "bad condition" and would overflow in rainy weather to such an extent that he would have to wade almost hip-deep to get to and from his house.

Warren P. Earp, who in 1948 had bought five houses near those of appellants, testified that the condition of the branch now is very little different from its condition in 1949. He testified that on December 8, 9 and 29, 1949, he and practically all of the owners of property in Meadow Bottom, among them Mrs. Hall, attended meetings of the Greenville Board of Health at which the problem of surface water in this area was discussed and inquiry made as to how relief could be obtained, it being suggested on several occasions that the branch be deepened and widened and extended straight to the Reedy River; but that the Board of Health "turned us down flat". From the testimony of this witness is appears that the property owners wanted the Board of Health to petition the City Council to remedy the situation, and that the Board of Health had declined to do so. It appears too, that at times there were present at these meetings the Mayor, the City Engineer, and several members of the City Council, but that they attended merely as spectators.

At a special meeting on November 15, 1949, the City Council of Greenville received a report from its Board of Health to the effect that the Board had condemned the houses in Meadow Bottom as unfit for human habitation and a menace to the health, morals and well-being of the community; and the City Council thereupon endorsed the action of the Board of Health and pledged its cooperation in the enforcement of the condemnation. The report of the Board to the City Council is not in evidence, and the minutes of the meeting of the City Council make no mention of the reasons upon which the Board based its finding that these properties were unfit for human habitation and a menace to

health and morals. It is inferable, however, from the testimony of the witness Earp concerning the meetings of the Board of Health in December, 1949, that the action of the Board was the result of inadequate drainage of the area in question. It is noted also that the city's answer to the complaint alleges that the Board of Health required appellants' properties to be vacated as unfit for human habitation "because of the general low and swampy area". Just when the properties were actually vacated does not appear in the record before us, but the letter from counsel for the several property owners to the City Council dated July 23, 1951, to which we shall later refer, indicates that the order of the Board of Health "which deprived these property owners of the use of their property" was dated March 15, 1950; and questions by appellants' counsel throughout the examination of the witnesses imply that the houses were not closed until some time in 1951.

Section 59-224 of the 1952 Code of Laws provides as follows:

"Whenever, within the boundaries of any municipality, it shall be necessary or desirable to carry off the surface water from any street, alley or other public thoroughfare along such thoroughfare rather than over private lands adjacent to or adjoining such thoroughfare, such municipality shall, upon demand from the owner of such private lands, provide sufficient drainage for such water through open or covered drains, except when the formation of the street renders it impracticable, along or under such streets, alleys or other thoroughfare in such manner as to prevent the passage of such water over such private lands or property. But if such drains cannot be had along or under such streets, alleys or other thoroughfare, the municipal authorities may obtain, under proper proceedings for condemnation as for highways on payment of damages to the landowner, a right of way through the lands of such landowner for the necessary drains for such drainage. If any municipal corporation in this State shall fail or refuse to carry out the provisions

of this section, any person injured thereby may have and maintain an action against such municipality for the actual damages sustained by such person."

Under this statute proof of negligence, in the usual sense of the word, in the design or construction of the drainage facilities installed by a municipality for the purpose of carrying off surface water along a street or other public thoroughfare is not an essential ingredient of the cause of action in favor of an adjacent landowner whose property has been damaged by surface water cast upon it as the result of such construction. His cause of action is complete if, after demand, the municipality has failed to provide, along or under the street on which the drainage work has been done, sufficient drainage to prevent the passage of the surface water from such street over the landowner's property. *Holliday v. City of Greenville*, 224 S. C. 207, 78 S. E. (2d) 279; *Belue v. City of Greenville, S. C.*, 84 S. E. (2d) 631.

The statute does not purport to make the municipality an insurer of the landowner against damage from surface water; it is only for such damage as results from the municipality's works that he may recover. By the same token, a municipality may not absolve itself from liability by diverting the surface water from its streets into a natural watercourse too small to carry it off. "The generally accepted doctrine as to casting surface water into a natural stream seems to be that a municipality has the right to do this provided the normal capacity of the stream is not overtaxed". 38 Am. Jur., Municipal Corporations, Section 644, page 351.

In the light of these principles, and of the evidence before referred to, we proceed now to consideration of the first two grounds upon which the nonsuit was ordered. As to the first ground, the issue in reality was whether or not there was evidence from which the jury might reasonably infer that the overflow of the "live stream" was the result of the city's construction of its drainage facilities. Similarly, as to the second ground the real issue was

not whether there was evidence of negligence, but whether the evidence warranted the inference that appellants' damage was the result of the street improvements. Substantially, therefore, the first two grounds of nonsuit, and the exceptions thereabout, present but a single issue. While all of the witnesses appear to agree that Meadow Bottom has always been a low, swampy area, and that appellants' property was subject to flooding by the overflow of the branch during heavy rains before the upper streets were paved and curbs and gutters installed in Oscar Street, the evidence bearing on the issue of whether this condition was aggravated as the result of these street improvements and damage to the property in question thereby resulted, is not very clear. We think, however, that it was sufficient to take that issue to the jury.

The third ground upon which the trial judge granted the nonsuit was that the damage to appellants' property, if any, was shown to have been the result of the property having been condemned by the Board of Health as unfit for human habitation, and that there was no showing that the action of the Board was arbitrary or capricious. It is apparent, as we have noted, that the unsanitary condition that occasioned the condemnation by the Board of Health was the result of the inadequate drainage of the Meadow Bottom area; and it is not suggested that the action of the Board was without justification. But the issue before the court was whether or not there was evidence sufficient to justify the inference, by the jury, that the inadequate drainage of the area and the consequent unsanitary condition of appellant's property resulted from the construction by the city of the drainage facilities incident to the improvement of the upper streets. If there was sufficient evidence as to that issue, the third ground of the motion for nonsuit should have been rejected; if not, it should have been sustained. But it would be begging the question to resolve the issue in favor of the motion merely because the unsanitary condition of the property was

such as to justify the city's Board of Health in condemning it as unfit for human habitation.

The fourth ground of nonsuit was the absence of proof that appellants had made demand upon respondent to correct the drainage situation in the area in question, as required by the statute. Appellants, by their fourth exception, contend that proof of such demand, sufficient to carry that issue to the jury, is to be found (a) in the testimony of the witness Earp, and (b) in a letter dated July 23, 1951, from appellants' counsel to the Mayor and Aldermen of the City of Greenville, Mr. Earp testified, as we have seen, to the fact that in December, 1949, he and most of the property owners concerned, including one of the appellants, had met on three occasions with the Board of Health of the City of Greenville, presumably as the result of the threatened condemnation, and at these meetings had discussed the problem of surface water in that area, had suggested changes in the existing system of drainage, and had requested the Board of Health to petition the City Council to remedy the situation.

Appellants offered in evidence the following letter:

"July 23, 1951

"Honorable J. Kenneth Cass, Mayor and Aldermen of the City of Greenville, South Carolina

"Gentlemen:

"This is to advise that we represent Mr. J. H. McCauley, Dr. W. T. Martin, Mr. C. H. Branyon, Mr. Warren P. Earp, Mrs. Robert W. Altom and the J. E. Hall Estate in connection with their respective properties located in the section of the City known as 'Meadow Bottom'.

"This is the property condemned by the Board of Health of the City of Greenville, without permitting the property owners to correct any conditions within their power or for which they could in any wise be considered responsible. The reasons given by the Board of Health for forbidding these property owners to take corrective measures to restore this rental property to sanitary and useful conditions were the

acts of the City of Greenville in maintaining inadequate sewer lines, storm sewers and drainage system in this area. The Board declared in substance that the sewer lines of the City were belching sewerage from the man holes in this section which was spreading over this low area contaminating the streams, the storm sewers of the City were discharging great quantities of surface water over this property and the water collected in the curbs and gutters along the side of the streets were emptying on this property thus making it unsanitary and unfit for human habitation, irrespective of what condition the houses were in or could be restored to. The unsanitary conditions created by the acts of the City were the only conditions over which the property owners had no control and could not correct in order to restore their property to usefulness.

"It seems clear that this is a taking of their property without compensation, in violation of Article I, Sections 5 and 17 of the Constitution of South Carolina and of the Fourteenth Amendment, Section 1 of the Constitution of the U. S.

"City Council is familiar with this condemnation proceeding as it is noted from the 'Minutes of Council Meetings', that a special meeting of Council was held November 15, 1949, at which members of the Board of Health appeared and reported it, requesting legislation to enforce the condemnation. At that meeting a resolution was unanimously adopted, approving the action of the Board of Health and pledged the full cooperation of City Council in enforcing the condemnaton. The order of the Board of Health, dated March 15, 1950, followed, which deprived these property owners of the use of their property.

"We respectfully request that Council, at its meeting July 24, 1951, take some measure to compensate these property owners, otherwise, they will be forced to seek redress through the Courts.

"Yours very truly,

"Hinson, Traxler & Hamer,

"JLH :rc

By: J. LaRue Hinson"

Counsel for respondent having objected to its admission upon the ground that it did not fulfill the requirements of the statutory demand, and that it contained irrelevant matter, colloquy among counsel and the trial judge ensued, in which it was stated that at a former trial the presiding judge had ruled this letter competent evidence of demand. Thereupon the trial judge ruled as follows:

"Well, I will let it in on the same ruling. It was the other judges' ruling. I am not so sure their ruling was sound or my ruling was sound. I wish I was certain about it, but I am going to give the complainants the benefit of the doubt on this thing. I may be wrong, but I don't like to have the complaint destroyed on a single ruling of mine although sometimes I have to do it in some cases; but I am going to let this letter go into the record, not to be read to the jury, and I will tell the jury that notice has been given without reading the letter.

"Mr. Traxler: That will be notice according to the Statute, Your Honor.

"The Court: According to the Statute."

It will be observed that the statute does not require that the demand be in writing, and does not specify the agency of the municipality to which it should be addressed. Essentially, the purpose of the demand is to notify the municipality, through its appropriate agency, of the damage done or threatened by surface water from its streets as the result of the construction of its street improvements, and of the need for more adequate drainage. As was said in *Hill v. City of Greenville*, 223 S. C. 392, 76 S. E. (2d) 294, in discussing the decision in *Macedonia Baptist Church v. City of Columbia*, 195 S. C. 59, 10 S. E. (2d) 350, the foundation of recovery under the statute is damage resulting from overt acts of the municipality which it has failed to remedy after notice. It is to be noted in the present case that in November, 1949, the city's Board of Health had reported to the City Council its condemnation of the houses in Meadow Bottom as unfit for habitation, and

that, as stated in the answer, the city knew that such condemnation was because of flooding by surface water. Whether the action of the affected property owners at the meeting with the city's Board of Health in December of that year was sufficient demand upon the city for relief was, under the testimony here, an issue for determination by the jury. In this view of the matter it becomes unnecessary to decide whether or not the letter of July 23, 1951, constituted sufficient demand to comply with the statute.

Finally, appellants contend that the trial judge erred in refusing to allow them to introduce in evidence Section 550 (4) of the 1944 City Code of Greenville, the language of which was identical with that of Section 59-224 of the 1952 Code of Laws of South Carolina. It appears from the discussions between counsel concerning its introduction, that Section 550(4) of the 1944 City Code was omitted in the 1953 codification; and counsel for the respondent states in his argument before this court that it had been repealed prior to the adoption of the 1953 City Code. Since the record does not disclose whether or not it was in force when the plaintiffs' cause of action, if any, arose, it is manifestly impossible for this court to determine whether or not it should have been admitted in evidence; nor is such decision necessary on this appeal, as the case must be remanded for a new trial because of error in ordering a nonsuit.

Reversed and remanded for new trial.

STUKES, TAYLOR and OXNER, JJ., concur.

BAKER, C. J., not participating.